**BOWLES, Administrator, Office of Price Administration, v. AMERICAN BREWERY, Inc.**

**Civil Action No. 2143.**

District Court. D. Maryland.

May 18, 1944.

Daniel B. Leonard, and Francis Key Murray, both of Baltimore, Md., for plaintiff.

Wilson K. Barnes, of Baltimore, Md., for defendant.

COLEMAN, District Judge.

This is an action for treble damages against the defendant, American Brewery, Inc., brought on behalf of the United States by Chester Bowles, Administrator, Office of Price Administration, under the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, §§ 901–946.

Summarized briefly, the contention of the Government is that the defendant, a Maryland corporation, and manufacturer of malt syrup from cereals for use in the domestic brewing industry, sold (which defendant does not deny) between January 18, 1943, and December 31, 1943, by the pound, quantities of this syrup to several brewing companies at prices which were in excess of the highest price charged by the American Brewery, Inc., during March, 1942, which was .0672¢ a pound, and which the Government claims was the maximum ceiling price permitted by the statute just referred to, and regulations promulgated pursuant thereto. Malt syrup is barley malt (which is barley germinated and dried) made into a solution with water. The alleged excess charges amounted to something over $32,000 and the Government is claiming treble damages under the statute, i. e., the sum of $96,351.42.

The case is before the Court on defendant's motion to dismiss the complaint on grounds which, briefly summarized, are (1) as respects the sales here involved, the price of malt syrup was not within the purview of any price regulation promulgated by the Office of Price Administration; (2) various Constitutional reasons; and (3) various irregularities in the procedure followed by the Price Administrator. Defendant also asserts that in no event may treble damages be imposed upon defendant.

The statutes, regulations and Executive Orders which bear upon the present controversy are, in chronological order, the following: First, the Emergency Price Control Act of 1942, enacted January 30th of that year, and particularly Section 3(c) thereof, 50 U.S.C.A. Appendix, § 903(c), which provides: "No maximum price shall be established or maintained for any commodity processed or manufactured in whole or substantial part from any agricultural commodity below a price which will reflect to producers of such agricultural commodity a price for such agricultural commodity equal to the highest price therefor specified in subsection (a)." Subsection (a) specifies the formulas whereby maximum prices on agricultural commodities themselves shall be established and maintained, these formulas being the use of (1) 110 per cent of the parity or comparable price of the given commodity, as adjusted by the Secretary of Agriculture; (2) the market price prevailing at specified times, or (3) the average price during a specified period, whichever one of the prices so ascertained was the highest.

Next, on October 2, 1942, by the Inflation Control Act of 1942, 50 U.S.C.A. Appendix, §§ 961–971, the provisions of the Emergency Price Control Act of 1942, above referred to, were amended. Thereby the criteria of maximum prices were made the parity or comparable prices, or the highest market or comparable prices for a specified period. Section 3 of the amendment provided, 50 U.S.C.A. Appendix, § 963: "And no maximum price shall be established or maintained under authority of this Act or otherwise for any commodity processed or manufactured in whole or substantial part from any agricultural commodity below a price which will reflect to the producers of such agricultural commodity a price therefor equal to the higher of the prices specified in clauses (1) and (2) of this section: Provided, That the President may, without regard to the limitations contained in clause (2), adjust any such maximum price to the extent that he finds necessary to correct gross inequities; but nothing in this section shall be construed to permit the establishment in any case of a maximum price below a price which will reflect to the producers of any agricultural commodity the price therefor specified in clause (1) of this section: Provided fur-

ther, That modifications shall be made in maximum prices established for any agricultural commodity and for commodities processed or manufactured in whole or substantial part from any agricultural commodity, under regulations to be prescribed by the President, in any case where it appears that such modification is necessary to increase the production of such commodity for war purposes, or where by reason of increased labor or other costs to the producers of such agricultural commodity incurred since January 1, 1941, the maximum prices so established will not reflect such increased costs: Provided further, That in the fixing of maximum prices on products resulting from the processing of agricultural commodities, including live stock, a generally fair and equitable margin shall be allowed for such processing: Provided further, That in fixing price maximums for agricultural commodities and for commodities processed or manufactured in whole or substantial part from any agricultural commodity, as provided for by this Act, adequate weighting shall be given to farm labor." So much for the statutory provisions applicable to the present case.

Prior to the amendment of October 2, 1942, just quoted, the Office of Price Administration had, on April 28, 1942, issued what is termed "The General Maximum Price Regulation", Bulletin No. 1, F. R. 3153, wherein it was provided (Section 1) that on and after the effective dates of this Regulation (the latest of which was July 1, 1942), and regardless of any contract or other obligation, "(a) no *person* shall *sell* or deliver any *commodity,* and no person shall sell or supply any *service,* at a price higher than the maximum price permitted by this Regulation; and (b) no person in the course of trade or business shall buy or receive any commodity or service at a price higher than the maximum price permitted by this Regulation."

In Section 9 of the same General Maximum Price Regulation, we find an enumeration of certain commodities excepted from its application, and in that enumeration malt extract is not included.

In the statement of considerations involved in the issuance of this General Maximum Price Regulation, is the following (p. 19): "Within the limits of present statutory authorization, this Regulation establishes maximum selling prices for all commodities and services for which

84

maximum prices have not hitherto been fixed," and the further statement that: "Every producer whose prices are stabilized is assured that his costs, which are based upon the stabilized prices of others, will not rise." ·

It is to be noted that this General Regulation antedated both the amendment to the law of October 2, 1942, and the period during which the present defendant is alleged to have exceeded the legal maximum price, i. e., between January 18, 1943, and December 31, 1943. Obviously that amendment called for some further administrative action to implement it, that is, for the passage of some new executive order to make effective the amendment which Congress had made to the original Price Control Act of 1942. And so, on October 3, 1942, the President sought to exercise the powers granted to him by the changes in the law, and issued Executive Order No. 9250, 50 U.S.C.A. Appendix, § 901 note. In that Executive Order (which was amended on September 25, 1943, by Executive Order No. 9281, but not in any respect pertinent to the present controversy) is the following:

"Title IV—Prices of Agricultural Commodities. 1. The prices of agricultural commodities and of commodities manufactured or processed in whole or substantial part from any agricultural commodity shall be stabilized, so far as practicable, on the basis of levels which existed on September 15, 1942 and in compliance with the Act of October 2, 1942.

*     *     *     *     *

"3. Subject to the directives on policy of the Director, the price of agricultural commodities shall be established or maintained or adjusted jointly by the Secretary of Agriculture and the Price Administrator; and any disagreement between them shall be resolved by the Director. The price of any commodity manufactured or processed in whole or in substantial part from any agricultural commodity shall be established or maintained or adjusted by the Price Administrator, in the same administrative manner provided for under the Emergency Price Control Act of 1942.

"4. *The provisions of sections 3(a) and 3(c)* [which are Secs. 903(a) and 903(c) of 50 U.S.C.A. App.] *of the Emergency Price Control Act of 1942 are hereby suspended to the extent that such provisions are inconsistent with any or all prices established under this Order for agricultural*

*commodities, or commodities manufactured or processed in whole or in substantial part from an agricultural commodity."* (Italics inserted.)

In spite of what appears to this Court to be the rather clear language employed both in the later Act of Congress and in this Presidential Order of October 3, 1942, the Government contends that the present case is to be governed by the blanket language of the General Maximum Price Regulation of April 28, 1942, and that, since that regulation fails to exempt malt syrup from its provisions, the defendant was required to adhere to the March, 1942, prices for its product. On the other hand, counsel for the defendant contends that this General Maximum Price Regulation was not, when reasonably and properly interpreted, intended to and does not embrace malt syrup sold during the period here involved, but that it was required that the maximum prices for same should be established, if at all, in accordance with the Inflation Control Act and Executive Order No. 9381 promulgated pursuant thereto, which was not done.

We believe that the Government's contention is unsound for the following reasons: First, we believe that the language of the Executive Order just quoted clearly indicates that whatever may have been the requirements prior thereto, it presupposed that any ceiling prices on commodities manufactured or processed in whole or substantial part from any agricultural commodity—and it is conceded in the present case by the Government that this malt extract falls within the definition of that phrase as used in the statute and regulation—should be determined in relation to and harmonized with the predetermined ceiling prices of the grain, i. e. the barley, the product of the soil itself, out of which the processed or manufactured agricultural commodity is made. As will be seen from paragraph 3 of the Executive Order, the ceiling prices of the grain itself are to be established in a particular way, namely, jointly by the Secretary of Agriculture and the Price Administrator. Government counsel in the present case admit that they know of *no* establishment of prices on barley until after the period here in controversy, and further that they are not advised that barley prices have *ever* been established, maintained or adjusted jointly by the Secretary of Agriculture and the Price Administrator, as required by Executive

Order No. 9381, and there has been a continuous rise in barley prices during the period here involved. Such being true, we feel that it is an entirely reasonable, proper construction of the statutory provisions and the Executive Order to say that there was not, for the period here in controversy, a regulation in effect covering the price of the commodity here in issue. The Executive Order clearly makes the establishment of ceiling prices on the grain itself a condition precedent to a determination of what shall be the ceiling prices for commodities manufactured or processed in whole or substantial part from the grain. Thus, whether we say that the General Maximum Price Regulation of April 29, 1942, to the extent that it may have been previously applicable to barley syrup, was impliedly repealed by the Executive Order, or whether we say, as is contended—and we believe with much merit—on behalf of defendant, that, by reasonable interpretation, there was no authority or intent to include barley syrup in that blanket regulation, without more, we arrive at the same conclusion.

We adopt the first of these theories, because we are satisfied it is reasonable to say that, insofar as this regulation might have had anything to do with prices that should control during the period here in controversy, it was repealed by the later Executive Order. This view is supported by the fact that on August 10, 1943, for the first time the Price Administrator specifically fixed the prices of malt extract as follows by Revised Supplementary Regulation, Amendment No. 15: "Sec. 1.221 Enzymatically-treated syrups manufactured from cereals and converted by the use of malt for use in the domestic malt brewing industry. (a) Manufacturers' maximum prices to brewers for enzymatically-treated syrups manufactured from cereals and converted by the use of malt shall be $6.45 f.o.b. plant per cwt. for shipments of 15 barrels or more and $6.50 f.o.b. plant per cwt. for shipments less than 15 barrels unless such maximum prices previously established under the General Maximum Price Regulation are higher than the prices specified herein.

"(b) All manufacturers increasing their maximum prices under the provisions of this section shall mail or otherwise supply a copy of this section to all purchasers prior to or at the time of the first delivery to such purchasers."

It is true that the regulation gives controlling effect to any higher maximum prices that might have been "previously established under the General Maximum Price Regulation." But whether we treat that as a mere catch-all clause, inserted out of an abundance of caution, or whether we say it was inserted because the Office of Price Administration was not sure as to just what was the result of these various changes in the law, it is an entirely reasonable conclusion to make that the Office of Price Administration was, itself, never really satisfied that there was any ceiling price effective for this extract, *prior* to the passage of the regulation just referred to.

In view of the conclusion which we reach, it becomes unnecessary to discuss the numerous other questions which have been raised and argued under the defendant's motion to dismiss, foremost among them being questions which go to the validity of the law itself, and the Executive Orders and regulations issued thereunder. Thus we need not deal with the Constitutional and procedural questions involved or raised by decisions of the Supreme Court, more particularly its decisions in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, and Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, rendered on March 27th last.

To summarize, in dismissing the complaint, we do not rest our decision upon the invalidity of any part of the statutes, Executive Orders or Regulations of the Office of Price Administration—because it is not necessary here to pass upon their validity or even to determine whether this Court has jurisdiction to do so—but solely and squarely upon the fact that we believe the fair and reasonable interpretation to be given to the Emergency Price Control Act, as amended in October, 1942, and of Executive Order No. 9250, issued pursuant thereto, is that the Office of Price Administration, whether unwittingly or intentionally, failed to cover, by appropriate regulation, the matter of price control of this particular commodity during the period here in question. We believe that this Court has jurisdiction to entertain this suit brought in the name of the Administrator on behalf of the United States, by reason of the following provisions of Section 205(e) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 925(e), which was not repealed by the later Inflation Control Act of 1942:

"If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. * * * If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States. Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed * * *. The provisions of this subsection shall not take effect until after the expiration of six months from the date of enactment of this Act."

However, we are not to be understood as deciding that, in the event the Government's complaint had been meritorious and the basis for a judgment in the Government's favor, the provision as to treble damages just quoted would become mandatory, because our dismissal of the complaint renders unnecessary a determination of this point. The same is true with respect to various other questions that have been raised relative to procedural points.

In conclusion, and to summarize, we find that defendant's motion to dismiss the complaint must, apart from any other grounds, be granted because the complaint fails to disclose any basis for a claim for damages against the defendant, since the price legally permitted to be charged for malt syrup for the period here in question was not controlled by the General Maximum Price Regulation of April 28, 1942, nor by any other price regulation effective and applicable to the price of malt syrup during such period; and that there is a failure to disclose any violation by the defendant of any law, or of any executive order or any other regulation promulgated in pursuance of any law. In short, we find that when such legislative and administrative action as was taken prior to, or during the period here involved, with respect to the price of malt syrup, is properly construed, it did not govern this case. Therefore, it becomes unnecessary to consider the various Constitutional and procedural questions which are also raised by defendant's motion to dismiss the complaint.

In granting the motion, we feel constrained to add that the very bringing of the present suit smacks of ill-advised and oppressive action on the part of the Government. Counsel for the Office of Price Administration have admitted in argument that they do not know whether the March, 1942, maximum price which the defendant obtained for malt syrup, which they claim controls in the present case, bears any proper relation to the prevailing prices of barley during the period in question, as is expressly required by the provisions of the Inflation Control Act of 1942, and Executive Order promulgated pursuant thereto. This obviously is a very serious, damaging admission on the part of Government counsel, indicating a flagrant omission on their part to determine, before bringing a suit of this kind, just what the precise facts and requirements of the law are. Government counsel admit that not a single customer of the defendant company has complained. While this fact in and of itself is, of course, not conclusive, it is not without significance in view of the further fact, as disclosed in the course of the hearing, that Government representatives first developed the belief that defendant had violated the law as a result of a bona fide inquiry made of the Office of Price Administration on behalf of defendant, as to whether, for the period in question, there was, in fact, any regulatory statute or administrative order or regulation by which defendant was governed. This is no suit for ordinary damages, but the Government seeks treble damages amounting to almost $100,000, and yet, there is a total absence of any showing of wilful attempt on the part of the defendant to evade the law. On the contrary, there is every evidence of a desire to comply with the law if, and when properly assisted in understanding its complicated and perplexing structure. In short, this suit appears to be calculated to defeat, rather than to promote, the suppression of inflationary activities which was the expressed object of Congressional and administrative action.

For the reasons just stated, an order will be signed dismissing the complaint.